**Robert J. NEELY, Petitioner-Appellant,**

v.

**Thomas ISRAEL, Respondent-Appellee.**

No. 83–1108.

United States Court of Appeals, Seventh Circuit.

Argued June 6, 1983.

Decided Sept. 2, 1983.

Certiorari Denied Jan. 4, 1984. See 104 S.Ct. 723.

---

Steven P. Weiss, Wis. State Public Defender, Madison, Wis., for petitioner-appellant.

Sally L. Wellman, Asst. Atty. Gen., Dept. of Justice of Wis., Madison, Wis., for respondent-appellee.

Before BAUER and FLAUM, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

FLAUM, Circuit Judge.

This is an appeal from an order of the United States District Court for the Eastern District of Wisconsin denying the appellant's petition for a writ of habeas corpus. For the reasons set forth below, we affirm the order of the district court.

The facts in this case are set forth fully in the Wisconsin Supreme Court opinion that affirms the defendant's conviction for first-degree murder. *See Neely v. State,* 97 Wis.2d 38, 292 N.W.2d 859 (1980). A summary of the facts that are relevant to the defendant's habeas corpus petition is as follows: On December 12, 1975, Felix Winters and two other men robbed Issac Haskins at Haskins' apartment in Milwaukee. After the robbery, Haskins and nine other men, including the defendant, tried to find Winters at the house of Winters' girlfriend, Kathleen Lessard. There, the defendant injected heroin into Lessard's arms, while the other men held a gun on both Lessard and her son and ransacked Lessard's house, in an effort to make Lessard reveal the whereabouts of Winters. Lessard agreed to take the men to the home of Helen Wright, the girlfriend of one of Winters' accomplices. Accompanied by Lessard and another man, the defendant forced his way into Wright's house, pointed a gun in Wright's face, and demanded to know where Winters was. Wright informed him that Winters went to Chicago. In connection with the events at the homes of Lessard and Wright ("the Lessard-Wright incidents"), the de-

fendant has been charged in Milwaukee County with ten felonies.

Several days after the Lessard-Wright incidents, Winters called Haskins to apologize for the robbery and to offer restitution. Winters told Haskins that the defendant had set up Haskins for the robbery. When Haskins confronted the defendant with this information, the defendant said that he would kill Winters. Pursuant to a murder plan devised by Haskins, Winters was asked by Haskins to accompany the defendant and three other men on an ostensible trip to Gary, Indiana. When the car was on a highway outside Milwaukee, the men faked a flat tire. The driver pulled over, everyone got out of the car, and Winters was shot to death.

At the defendant's trial for the murder of Winters, the defendant testified on direct examination that he was a drug dealer who bought drugs from Haskins, but who worked primarily on his own. He related his activities on the day of Winters' death, describing how he went to Haskins' apartment to buy drugs. The defendant testified that he had no knowledge of any plan to kill Winters, and he portrayed Haskins as having no anger toward Winters. According to the defendant's testimony, Haskins asked the defendant to accompany Winters and the other men to Gary to retrieve the possessions that Winters had stolen from Haskins, and the defendant grudgingly agreed. The defendant testified that Haskins wanted the defendant to guard the safety of both Haskins' possessions and Felix Winters. The defendant depicted the shooting of Winters as taking place while the defendant was an unsuspecting passenger in the car, and he flatly denied any involvement in the shooting.

During cross-examination, the prosecutor asked the defendant about the Lessard-Wright incidents. The defendant refused to answer on the grounds that his answer might incriminate him. Although the court ordered him to respond, the defendant persisted in his refusal, asserting his fifth amendment privilege seven times in the presence of the jury. The defendant was convicted of first-degree murder, and the conviction was affirmed by both the Wis-

consin Appellate Court and the Wisconsin Supreme Court. The defendant then sought a writ of habeas corpus, which was denied by the United States District Court for the Eastern District of Wisconsin.

In appealing this denial, the defendant argues that the trial court permitted the cross-examination regarding the Lessard-Wright incidents solely on the basis of Wisconsin's "wide open cross" rule. *See* Wis. Stat. § 906.11(2). He maintains that the rule allows cross-examination of the accused with regard to any issue relevant to the whole of the case, regardless of the scope of direct testimony, and that this violates the accused's right against self-incrimination. He denies that the prosecutor's questions regarding the Lessard-Wright incidents were within the scope of the direct examination, pointing out that the direct examination scrupulously avoided mentioning the Lessard-Wright incidents. Furthermore, the defendant asserts that participation in the Lessard-Wright incidents does not prove participation in the murder, since nine or ten men were involved in the Lessard-Wright incidents, while only four men were involved in the murder. The defendant also argues that the trial court denied him a fair trial by causing him to assert his fifth amendment rights in front of the jury, by allowing the prosecutor, in his closing argument, to refer to the defendant's refusals to answer, and by instructing the jury that they could draw inferences from these refusals.

The appellee argues that an accused who takes the stand waives his privilege against self-incrimination as to matters that are reasonably related to the subject matter of his direct examination and that are thus within the scope of the direct examination. According to the appellee, the Lessard-Wright incidents were proper subjects of cross-examination because they constituted circumstances connecting the defendant to the murder, and they were relevant to his protestation of innocence, which was the subject of his direct testimony.

■ It is clear that a defendant who takes the stand waives his privilege against

self-incrimination on matters reasonably related to the subject matter of his direct examination. *McGautha v. California,* 402 U.S. 183, 215, 91 S.Ct. 1454, 1471, 28 L.Ed.2d 711 (1971), *vacated in part on other grounds,* 408 U.S. 941, 92 S.Ct. 2873, 33 L.Ed.2d 765 (1972); *Brown v. United States,* 356 U.S. 148, 157, 78 S.Ct. 622, 627, 2 L.Ed.2d 589 (1958); *Johnson v. United States,* 318 U.S. 189, 195, 63 S.Ct. 549, 552, 87 L.Ed. 704 (1943). The rationale is that a witness who foregoes his right not to testify cannot then claim that he is immune from cross-examination on the matters that he has chosen to put in dispute through his direct testimony. *Brown v. United States,* 356 U.S. at 155–56, 78 S.Ct. at 626–27.

The question of whether a defendant has put a matter in dispute during his direct examination has been subject to broad interpretation. In *United States v. Havens,* 446 U.S. 620, 628, 100 S.Ct. 1912, 1917, 64 L.Ed.2d 559 (1980), the defendant had been implicated by a companion, who had been arrested for carrying cocaine in the makeshift pockets of a T-shirt. The defendant took the stand and testified that he had never engaged in smuggling activities with the companion. On cross-examination, the prosecutor asked the defendant if he had had anything to do with sewing pockets on T-shirts. When the defendant denied such involvement, the prosecutor introduced a cut-up T-shirt that had been illegally seized from the defendant. The Supreme Court ruled that the defendant's direct testimony "could be understood as a denial of any connection with [the companion's] T-shirt and as a contradiction of [the companion's] testimony." *Id.* at 628, 100 S.Ct. at 1917. The Court ruled that the prosecutor's questions regarding the T-shirt grew out of this direct testimony. Since the cross-examination questions would have been suggested to a reasonably competent cross-examiner by the defendant's direct testimony, the impeaching use of the illegally seized evidence was proper. *Id.* at 627–28, 100 S.Ct. at 1916–17. *See also Johnson v. United States,* 318 U.S. 189, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (where the defendant was charged with tax evasion for the years 1935 through 1937 and testified that he only received illegal payments until November 1937, the prosecutor's question regarding the receipt of such payments in 1938 was relevant to the continuing nature of the defendant's activities, which the defendant's direct testimony had refuted).

Federal courts consistently have followed this broad approach when determining the proper scope of a defendant's direct testimony. *See e.g., United States v. Pilcher,* 672 F.2d 875, 877–78 (11th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 306, 74 L.Ed.2d 286 (1982); *United States v. Beechum,* 582 F.2d 898, 907–09 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); *United States v. Hearst,* 563 F.2d 1331, 1342 (9th Cir.1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); *United States v. Palmer,* 536 F.2d 1278, 1282 (9th Cir.1976); *Melendrez-Rodriguez v. United States,* 441 F.2d 1109, 1110 (9th Cir.1971). In *United States ex rel. Doss v. Brewer,* 685 F.2d 1003, 1013 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 101, 74 L.Ed.2d 91 (1982), the defendant testified that he never entered a sporting goods store to buy .32 caliber shells on the day of the murder. He also denied that he and several others practiced target shooting with any gun other than a shotgun on that day. During cross-examination, the prosecutor asked the defendant whether he had seen a pistol on the night of the murder. The defendant then testified to having seen two pistols, including the .32 caliber murder weapon, at about 4:00 a.m. on the following day. The court in *Doss* ruled that the prosecutor's questions were proper. The defendant's direct examination testimony carried the clear implication that the defendant was claiming to have had no connection with a .32 caliber pistol on the day of the murder, and this general denial reasonably called for the prosecutor's questions regarding whether the defendant had seen any pistol on the night of the murder. *Id.* at 1014.

■ In the present case, the defendant took the stand and described himself as working independently from Haskins and his men. The defendant also related a conversation that he had with Haskins in which

Haskins indicated that he bore no ill feelings toward Winters with regard to the robbery. This testimony is similar to the direct testimony in *Havens* and *Doss;* it can be understood as a denial of any connection with Haskins and his gang during the period following the robbery. Although the defendant attempted to limit his testimony to the day of the murder, both his general statement regarding his business dealings with Haskins' gang and his account of his conversation with Haskins gave the clear implication that he had been an outsider for more than just a day. The defendant's testimony thus placed in issue his relationship with Haskins' gang and his knowledge of Haskins' feelings toward Winters during the period after the robbery. Since the Lessard-Wright incidents were probative of these issues, the prosecutor's questions were reasonably related to the defendant's direct examination. We therefore hold that there was no violation of the defendant's right against self-incrimination.

Having decided that the cross-examination was properly within the scope of the direct examination, we need not consider the defendant's contention that the trial court originally allowed the questions on the basis of Wisconsin's wide open cross rule. It is settled that "[t]he prevailing party may . . . assert in a reviewing court any ground in support of [its] judgment, whether or not that ground was relied upon or even considered by the trial court." *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970). *See also Smith v. Phillips,* 455 U.S. 209, 102 S.Ct. 940, 945 n. 6, 71 L.Ed.2d 78 (1982). Thus, we do not reach the issue of the constitutionality of Wisconsin's wide open cross rule.

■ Furthermore, we find no merit to the defendant's argument that he was denied a fair trial. Through his direct testimony, the defendant waived his right to invoke the fifth amendment with regard to the Lessard-Wright incidents. It therefore was not error for the trial court to demand that he answer the questions, and "[a]ny prejudice deriving from the invocation of the privilege is . . . attributed to [his] decision to testify." *United States v. Beechum,* 582 F.2d 898, 909 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). *See also United States v. Hearst,* 563 F.2d 1331, 1342 (9th Cir.1977), *cert. denied,* 435 U.S. 1000, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978). Given the impropriety of the defendant's fifth amendment claim and his refusals to answer the questions regarding the Lessard-Wright incidents, the trial court also did not err in allowing the prosecutor to refer to the defendant's refusals during the prosecution's closing argument, *see Fitzpatrick v. United States,* 178 U.S. 304, 316, 20 S.Ct. 944, 949, 44 L.Ed. 1078 (1900), and in instructing the jury that they could draw inferences from the defendant's refusals, *see Caminetti v. United States,* 242 U.S. 470, 494, 37 S.Ct. 192, 198, 61 L.Ed. 442 (1917).

Accordingly, the denial of the defendant's petition for a writ of habeas corpus is affirmed.